UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LILLIE REA AND** <br> **HILDA WIRATUNGA** | **CIVIL ACTION** |
| **VERSUS** | **NO. 12-1252** |
| **WISCONSIN COACH LINES, INC.,** <br> **ET AL** | **SECTION "K"(3)** |

## ORDER AND REASONS

Before the Court is Plaintiff's Motion for New Trial pursuant to Federal Rule of Civil Procedure Rule 59 filed by Plaintiff, Lillie Rea. (R. Doc. 256). Having reviewed the motion, memoranda, exhibits, record, and relevant law, the Court DENIES the motion for the following reasons.

**I.    BACKGROUND**

This case involved an automobile accident that occurred on March 29, 2011, in New Orleans, Louisiana and involved two drivers: the Plaintiff, Lillie Rea, and the Defendant, Larry Westphal. At the time of the accident, Mr. Westphal was driving a tour bus, owned and operated by Mr. Westphal's employer and co-Defendant, Wisconsin Coach Lines, Inc ("Wisconsin Coach Lines"). As a result of the accident, the Plaintiff alleged that she sustained serious physical injuries and brought the instant suit seeking compensation.

The issues of liability and damages were contested by the parties, and the matter proceeded to trial on March 9, 2015. On March 13, 2015, the jury returned a verdict in favor of the Defendants, finding no fault attributable to Larry Westphal or Wisconsin Coach Lines and finding Lillie Rea solely at fault; the jury thus awarded no damages to the Plaintiff.

Plaintiff, Lillie Rea, has filed the instant Motion for New Trial contesting the validity of the verdict, and Defendants have opposed the motion. The Court will address the merits of the motion herein.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 59 provides that a district court "may, on motion, grant a new trial on all or some of the issues ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "The decision to grant or deny a motion for new trial is within the sound discretion of the trial court." *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998).

Although Defendants opine that "Plaintiff attempts to lighten her burden through the [the application of the Supreme Court's decision in *Gasperini v. Center for Humanities,* 518 U.S. 415] and Louisiana law," Plaintiff, in fact, correctly applied Louisiana law to the Rule 59 determination in this case.  See Def. Mem. Opp. 4, R. Doc. 266.  In the wake of *Gasperini*, the Fifth Circuit explained that "in an action based on state law but tried in federal court by reason of diversity of citizenship, a court must apply a new trial or remittitur standard according to the state's law controlling jury awards for excessiveness or inadequacy," *Foradori v. Harris*, 523 F.3d 477, 497 (5th Cir. 2008), contradicting prior Fifth Circuit precedent, which held that the sufficiency or insufficiency of the evidence in relation to the verdict is "indisputably governed by a federal standard," *Jones v. Wal-Mart Stores, Inc.*, 870 F.2d 982, 986 (5th Cir. 1989).[1]  The Fifth Circuit later clarified the application of *Gasperini* in *Fair v. Allen*, applying Louisiana law in the context of a Rule 59 motion for new trial and overruling *Jones*.  669 F.3d 601, 604 (5th Cir. 2012) ("[T]he district court erred in applying the federal standard; Louisiana law applies.")

---

[1] Even if Louisiana law had not applied to Plaintiff's motion for a new trial, the Court would reach the same conclusion under the federal standard. *See Ford v. J.B. Hunt Transp., Inc.,* No. CIV.A. 12-414-RLB, 2015 WL 300411, at *5 (M.D. La. Jan. 22, 2015).

2

Subsequently, district courts in this circuit have continued to apply state law to such cases. *See, e.g.*, *Body By Cook v. Ingersoll-Rand Co.*, 39 F. Supp. 3d 827, 844 (E.D. La. 2014); *Martinez v. Massey,* No. 11-CV-648, 2015 WL 1809218, at *1 (M.D. La. Apr. 21, 2015). Because jurisdiction in this matter is based on diversity of citizenship between the parties, the Court thus will apply the law of Louisiana in determining the merits of the motion for new trial pursuant to Rule 59.  *See Fair v. Allen*, 669 F.3d 601, 605 (5th Cir. 2012).

Louisiana Code of Civil Procedure article 1972 provides mandatory or peremptory grounds upon which a court must grant a new trial.  *See Horton v. Mayeaux*, 2005-1704 (La. 5/30/06), 931 So. 2d 338, 343.  Specifically, article 1972 provides that a new trial shall be granted "[w]hen the verdict or judgment appears clearly contrary to the law and the evidence." La. Code Civ. Proc. Ann. art. 1972.  Nevertheless, "the jurisprudence interpreting the provision recognizes the trial judge's discretion in determining whether the evidence is contrary to the law and evidence [, which . . . . requires a discretionary balancing of many factors."  *Martin v. Heritage Manor S. Nursing Home*, 2000-1023 (La. 4/3/01), 784 So. 2d 627, 630-32 (quoting *Davis v. Wal-Mart Stores, Inc.,* 00-0445 (La.11/28/00), 774 So.2d 84) (internal quotation marks omitted).  In considering a motion for new trial under article 1972, "the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness."  *Martin,* 784 So. 2d at 631 (quoting *Joseph v. Broussard Rice Mill, Inc.,* 00-0628 (La.10/30/00), 772 So.2d 94) (internal quotation marks omitted).  However, "[e]ven in light of this wide discretion of the trial court, that discretion is limited, as the trial court cannot freely interfere with any verdict with which it disagrees."

*Guillory v. Lee*, 2009-0075 (La. 6/26/09), 16 So. 3d 1104, 1131.  The Louisiana Supreme Court has explained:

> The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. *A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light.* Thus, the jury's verdict should not be set aside if it is *supportable by any fair interpretation of the evidence.  Gibson v. Bossier City General Hospital, et al., supra. See also Engolia v. Allain,* 625 So.2d 723 (La.App. 1 Cir.1993). (Emphasis added.)

*Davis,* 774 So. 2d at 93.  In sum, it is clear that, "[d]espite permitting a trial court to review the jury's credibility determinations, Louisiana gives the jury high deference." *Fair*, 669 F.3d at 605.

Louisiana Code of Civil Procedure article 1973 also provides discretionary grounds upon which a court may grant a new trial: "A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law."  La. Code Civ. Proc. Ann. art. 1973.  Article 1973 of the Louisiana Code of Civil Procedure allows a district court to use its discretion to order a new trial whenever it is "convinced by [its] examination of the facts that the judgment would result in a miscarriage of justice." *Horton,* 931 So. 2d at 343-44 (quoting *Lamb v. Lamb,* 430 So.2d 51, 53 (La.1983)). Indeed, Louisiana courts have traditionally held that where a miscarriage of justice would otherwise occur, a district court has "virtually unlimited discretion to grant a new trial." *Id.* (citations omitted). "Generally, the only requirement has been that the district court 'state an articulable reason or reasons as to why [it] is exercising his discretionary

powers.'" *Id.* (quoting *Burris v. Wal-Mart Stores, Inc.,* 652 So.2d 558, 562 (La.App. 1 Cir.), *writ denied,* 654 So.2d 562 (La.1995)).[2]

In *Lamb v. Lamb,* the Louisiana Supreme Court set forth the standard for granting a new trial pursuant to La.Code Civ. Proc. art. 1973:

> A proper application of this article necessitates an examination of the facts and circumstances of the individual case. When the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered.... We have recognized that the [trial] court has much discretion regarding this determination. However, this court will not hesitate to set aside the ruling of the trial judge in a case of manifest abuse.

430 So.2d 51, 53 (La.1983); *see Joseph v. Broussard Rice Mill, Inc*., 2000-0628 (La. 10/30/00), 772 So. 2d 94, 104.  The reviewing court may evaluate the evidence and witness credibility in the same manner as under Louisiana Code of Civil Procedure article 1972. *See Broussard Rice Mill,* 772 So. 2d at 104.

## III.    DISCUSSION

Plaintiff, Lillie Rea, has filed the instant Motion for New Trial contesting the validity of the verdict.  In her motion, Plaintiff contends that she is entitled to a new trial for two reasons: (1) under Louisiana Code of Civil Procedure article 1972, the jury's verdict is clearly contrary to the evidence; and (2) under Louisiana Code of Civil Procedure article 1973, Plaintiff alleges that Defendant's counsel's introduction of excluded evidence  as well as the "the cumulative effect of the Court's rulings [on evidentiary matters] allowed the jury to see and hear prejudicial evidence" and resulted in substantial injustice.  *See* R. Doc. 256, at 20.

### A.    Weight of the Evidence

---

[2] See *Horton*, 2005-1704 (La. 5/30/06), 931 So. 2d at 344-45, for a discussion of the reasons for the two differing standards for granting of a new trial under mandatory versus discretionary in Louisiana.

5

As to Plaintiff's first argument, she contends that the evidence did not show that Lillie Rea was legal cause of the accident or that the Defendant, Larry Westphal, was not negligent and not the legal cause of the accident.  In general, Plaintiff alleges that the bus driven by Larry Westphal was stopped in the left lane of a two-lane street at a red light at the corner of North Peters Street and Canal Street in New Orleans, parallel with Plaintiff's car, when Larry Westphal "decided" to make a right turn and struck Plaintiff's vehicle.  Plaintiff notes that Defendant's accident reconstruction expert, Mr. Dean Tekell, agreed that the bus was stopped at the intersection prior to impact, that the bus moved into the car, that Mr. Larry Westphal stated he decided to make a right turn, and that no parking lane existed where the accident occurred.  Plaintiff also notes that her accident reconstruction expert, Mr. James Loumiet, testified that the damage to the Plaintiff's vehicle indicated that the right front bumper of the bus struck he left front driver's door of the Plaintiff's car, indicating that the bus moved into the car consistent with Larry Westphal's attempt to make a right turn and that the lack of evidence of scratches on the car indicates that Lillie Rea's vehicle was not moving at the time of impact.  Plaintiff also offers the testimony of Officer Alan Seaton, the police officer who reported the accident, who testified that Larry Westphal stated that he was in the process of turning north bound on Canal Street when he struck the Plaintiff's vehicle.  On cross-examination, Plaintiff notes that Larry Westphal testified in a prior deposition that he did not recall stating that he decided to turn right in contrast to his statement to Officer Seaton; Plaintiff also notes that, at trial, Larry Westphal stated that that he believed that the Plaintiff's car was in the parking lane, that his bus was not moving at the time of the accident, and admitted that he did not know whether the Plaintiff's car was moving or not before the accident.

Plaintiff asserts also that every testifying witness stated that both the bus and the Plaintiff's car were stopped at the red light at the intersection prior to the accident, that the car was located to the right of the bus, and that the bus was attempting to take a right turn. Further, Plaintiff reiterates that testimony and other evidence demonstrated that no parking lane at the intersection existed. At trial, Lillie Rea testified that her car was stationary next to the bus, which was in the left lane, and that the bus began to move toward her vehicle when she sounded her horn and the bus struck her vehicle. The passenger in the Plaintiff's car, Plaintiff's grandmother, also testified that the bus was in the left lane and the car was in the right lane and that both vehicles were stopped at the red light before the bus hit the car. Plaintiff concludes, therefore, that the evidence shows that she was in the right lane of travel, and that there exists no possible circumstance where she could be the legal cause of the accident. Finally, the Plaintiff argues that the jury's finding that Plaintiff Lillie Rea suffered no damages is unsupportable by a fair interpretation of the evidence, and Plaintiff submits trial testimony from various testifying physicians in support of her contention.

Defendants oppose Plaintiff's motion and assert that the jury had sufficient evidence to find the Plaintiff at fault, stating also that Plaintiff has misconstrued trial testimony in her motion. The Defendants offer another version of the accident. Defendants first note that the right lane of travel on North Peters was unusually wide at 17.5 feet and allowed both the bus and the Plaintiff's car to fit next to each other in the right lane. According to Mr. Westphal (and other witnesses), it appeared that Plaintiff's car "squeezed" by to the right of the bus in a passing maneuver by illegally approaching the intersection through the parking lane.

The Defendants notes that their accident reconstruction expert, Mr. Dean Tekell, testified that the parking lane stopped approximately 95 feet before the intersection, and that,

7

based on the location and length of the bus, the Plaintiff would necessarily have had to enter the parking lane to make a passing maneuver.  In addition to Mr. Tekell's testimony, on cross-examination, Plaintiff's accident reconstruction expert, Mr. James Loumiet, agreed that the right lane was 17.5 feet wide and that Plaintiff's car could fit between the dotted center line of the road and the curb.  Mr. Loumiet also testified that the bus's tire may have been the point of impact and that there had to be some lateral movement, possibly creating multiple points of contact along the Plaintiff's car.  Defendants refute Plaintiff's contention that the bus was in the left lane with testimony from the Defendant Larry Westphal, bus passenger and witnesses Eugene Ott and Jacqueline McGill, and Officer Alan Seaton, who reported the accident. Defendants refute Plaintiff's statement that her car was stationary at the time of the accident with testimony from the police officer who reported the accident, who testified that Lillie Rea told the officer she was travelling at the time of the accident. Defendants also offer trial testimony impeaching the Plaintiff as to her statement that the vehicles were parked in a parallel position before impact and that the bus's back wheels were located on the median between the northbound and southbound traffic with her statement that the front right corner of the bus hit her car.

      Under Louisiana Civil Code of Procedure article 1972, this Court may evaluate evidence and witness testimony to determine whether the jury's verdict could be supported by any fair interpretation of the evidence.  The Court notes that, after undertaking an extensive review of the evidence and testimony at trial, on several occasions Plaintiff's Opposition mischaracterizes trial testimony as to critical factual issues relevant to the determination of liability.  The differences between Lillie Rea's and Larry Westphal's accounts of the accident placed at issue whether the two vehicles were both stopped at the red light before proceeding

through the intersection; where the vehicles were stopped in relation to each other as well as to the stop-line at the red light, assuming both vehicles were stopped; and whether the bus turned into the Plaintiff's car or whether the Plaintiff struck the bus. Based on the jury's evaluation of these facts, the jury could determine whether the accident was caused by the negligence of the Defendant, the Plaintiff, or both.

Plaintiff alleges that she was stopped at the intersection and that the bus turned into her. Her account is supported by the testimony of her grandmother and by the deposition testimony from the eye-witness bus passenger, Eugene Ott, both of whom state that her vehicle was stopped prior to the accident. *See* Trial Tr. vol. 1, 132-34, Mar. 9, 2015, R. Doc. 258; Trial Tr. vol. 4, 831, Mar. 12, 2015, R. Doc. 261. However, Mr. Ott also repeatedly stated that it appeared that Plaintiff "squeezed" by the bus. Trial Tr. vol. 4 829. Defendant's accident reconstruction expert acknowledged that, based damage to Plaintiff's car indicating one point of impact, the Plaintiff's car would necessarily have had to have been stationary but that if more than one point of impact existed, the Plaintiff's car would have been in motion. Trial Tr. vol 4. 950-51. Contradicting Plaintiff's account, the Defendant offered the testimony of the reporting police officer and his report, in which he recorded Plaintiff's statement to him that she was travelling in the lane of traffic at the time of the accident and that she was in the process of turning right. Trial Tr. vol. 1, 222-23, 227. On cross-examination, the Plaintiff could not explain why the officer would have recorded that statement. Trial Tr. vol. 2, 369-370. In addition, another bus passenger, Jacqueline McGill, testified in her deposition that she witnessed Plaintiff drive her car along side the bus in an apparent attempt to "try and beat" the bus at the red light and that her vehicle never stopped. Trial Tr. vol. 3, 751. Defendant Larry Westphal acknowledged that he

did not see the Plaintiff's vehicle prior to the accident despite having checked both mirrors twice before attempting to turn the bus.  Trial Tr. vol. 4, 897.

As to the locations of the cars, the Defendant stated that his bus was stopped 50 feet back from the intersection, while Plaintiff testified that her car was stopped somewhat further behind the bus.  *See* Trial Tr. vol. 4, 894; vol. 2, 370-372.  However, on cross-examination, Defense counsel questioned Plaintiff about this fact based on her deposition testimony wherein she stated that she was stopped parallel to the bus.  Trial Tr. vol. 2, 372-373.  Although Mr. Ott testified that he believed the car was stopped parallel with the bus, he also testified that he did not know whether the Plaintiff's car moved when the bus moved and could not recall how long after the car came to rest that the bus began to move.  Trial Tr. vol. 4, 831-833.  Defendant's expert Mr. Tekell opined that, based on the location of the damage to Plaintiff's driver side door, the bus could not have created such damage if the cars were parallel.  Trial Tr. vol. 4, 945.  Further, Mr. Tekell suggested that the damage could have been from the bus's front right tire or the bus's right front bumper, and Mr. Loumiet acknowledged that the bus's tire could have created the damage. Trial Tr. vol. 4, 946; Trial Tr. vol. 1, 266.

In addition, Plaintiff maintained that she was in the right lane of travel and that the Defendant Westphal was in what she referred to as the "center" lane or "left" lane, interchangeably, and at times referring to the street as having three lanes.  *See* Trial Tr. vol.4, 915; vol. 2, 324.  She maintained that, because all eye witnesses testified that the Plaintiff's car was to the right of the bus, the bus must necessarily have been in the left lane.  However, testimony from both accident reconstruction experts showed that North Peters was a two-lane street, and that the right lane was 17.5 feet wide—large enough for both the bus and the Plaintiff's car to fit side-by-side.  Trial Tr. vol. 1, 270; vol. 4, 944.  Both experts agreed that the

parking lane ended 95 feet back from the intersection. Trial Tr. vol. 4, 944; vol. 1, 254. Mr. Tekell also testified that, based on the Defendant's account of where the bus was stopped, the Plaintiff would necessarily have had to travel through the parking lane before approaching the intersection. Trial Tr. vol. 4, 955. Defendant Larry Westphal testified that he believed the right portion of the lane was a parking lane or a "curb lane" and assumed that no car would be travelling in it. Trial Tr. vol. 4, 892, 919.

Finally, as to whether the bus hit the car or vice versa, only the Plaintiff, her grandmother, and one bus passenger testified as to this point. Trial Tr. vol. 1, 135, 327. While the Plaintiff and her grandmother insisted that the bus moved into the car, Ms. Jacqueline McGill, a bus passenger eye witness, testified that the Plaintiff's car hit the bus. Trial Tr. vol. 3, 751, R. Doc. 260. Neither of the accident reconstruction experts could opine as to this point based on the evidence presented nor could the Defendant Westphal offer any opinion on the matter as he admitted he did not witness Plaintiff's vehicle. Bus passenger Mr. Ott testified that he did not know whether the Plaintiff's car was in motion when the bus moved but testified that, almost instantly after the signal changed, the bus was "hardly moving" when heard a "thump" from the impact. Trial Tr. vol. 4, 833-34.

Although Plaintiff testified at trial that Mr. Westphal told her he was sorry and that he did not see her immediately after the accident, Plaintiff's account on that point accords with Mr. Westphal's own admission that he did not see her vehicle prior to the accident. The Plaintiff's own account, however, was put into question by Mr. Westphal's statement that she asked him if he wanted to just "forget it" after the accident, Trial Tr. vol. 4, 898. In addition, Defense counsel called into question Plaintiff's account when, during examination, when she could not recall what portion of the bus hit her car, Trial Tr. vol. 2, 372-73, and when she made inconsistent

statements in trial and at her deposition as to whether she stopped her car parallel to the bus or slightly in front of the bus, Trial Tr. vol. 3, 370.

Upon review of Mr. Westphal's testimony, any apparent inconsistences in Mr. Westphal's account were created by Plaintiff's counsel's own mischaracterization of his prior testimony.[3] Despite Plaintiff's attempt to characterize Mr. Ott's knowledge of this as evidence of a close relationship,[4] no testifying bus passenger knew Mr. Westphal as more than an acquaintance and only travelled with Mr. Westphal during the one-week trip from Wisconsin to New Orleans. *See* Trial Tr. vol. 3, 746-47; vol. 4, 824-26, 890.

In light of the testimony and evidence discussed above and the inconsistencies in Plaintiff's own account,[5] it is clear that the weight of the evidence does not militate against the verdict; indeed, the jury could have fairly interpreted the evidence in favor of the Defendants. Testimony from Officer Seaton and the eye witness bus passengers appears to support Larry Westphal's account of the accident, and Plaintiff did not successfully establish any substantial inconsistencies in Mr. Westphal's account. Given the inconsistencies in Plaintiff's account, by contrast, the jury could have interpreted the evidence to show that the Plaintiff's vehicle was moving through the right lane on the right side of the bus in an attempt to pass or overtake the bus in the process of making a right turn at the intersection.

---

[3] *See, e.g.*, Trial Tr. Doc. 261, at 915-918; 930-933. For example, Plaintiff's counsel asked Mr. Westphal about his alternate theory of the accident, to which he replied that, at deposition, Plaintiff's counsel "was questioning me, and she just kept on going around in circles, around in circles. She got me so confused and messed up, and she said: What would an alternate theory [of the accident] be? What do you think? And I told her off the top of my head what could have happened, but I didn't believe that happened." *Id.* at 933. Mr. Westphal then gave his account of the "alternate theory." To rebut this testimony, Plaintiff's counsel attempted to impeach Mr. Westphal with what his alternate theory was in deposition. *Id.* at 934. However, the deposition testimony reflect accurately what Mr. Westphal testified to at trial. *Id.*

[4] Plaintiff noted during trial that Mr. Ott testified that Mr. Westphal was upset about the accident and stated that it was his first accident.

[5] Based on the Court's own observations made during trial and review of the trial transcript, the Court found the Plaintiff's testimony obfuscating, defensive, and indirect. Seldom did she give a direct answer. Thus, the Court's own evaluation of Plaintiff's testimony affords weight to the jury's verdict.

### B.    Jury Prejudice

Alternatively, the Plaintiff argues that the Court's rulings on certain evidentiary matters cumulatively resulted in prejudicial error that warrants a new trial.  Specifically, Plaintiff contends that the following rulings were overly prejudicial and casted Plaintiff's character in a negative light: (1) the ruling that the Defendant could introduce ten relevant Facebook photos of the Plaintiff; and (2) the ruling allowing the Defendant to introduce evidence of Plaintiff's income as relevant to the Plaintiff's claim for loss of earning capacity.  The Plaintiff also alleges that the Defendants improperly attempted to introduce an "excluded exhibit" into evidence, which was confusing to the jury and prejudicial to the Plaintiff.

#### 1.    Facebook Photographs

Plaintiff asserts that the ten photographs from Facebook constituted character evidence under Federal Rule of Evidence 405(b), and should have been excluded as Plaintiff had not introduced any character evidence at trial.  Plaintiff alleges that the facts surrounding her accident and her post-accident treatment and pain were the sole issues at trial, and the introduction of this evidence constituted prejudicial error. Defendants argue that no procedural errors occurred as the Facebook pictures of the Plaintiff offered into evidence were relevant and related to the Plaintiff's claim of loss of enjoyment of life and were used to impeach her testimony on that point.

While Plaintiff argues that the Facebook photos were prejudicial and were an attempt to impugn the Plaintiff's character, the Court maintains, as stated in its original ruling, that the photographs were not inadmissible under the Federal Rules of Evidence Rule 403.  *See* Order, March 5, 2015, R. Doc. 231, 9-10.  The ten photographs introduced into evidence at trial—out of

the seven hundred submitted to the Court— had relevance as to the issue of the Plaintiff's claim of loss of enjoyment of life and impeachment value sufficient to overcome any risk of prejudice.

### 2. Plaintiff's Employment Benefits

Plaintiff suggests that the introduction of evidence that Plaintiff's expenses were paid by her employer, her family's record store, was inadmissible as it did not relate to Plaintiff's loss of earning capacity claim and was prejudicial as it suggested to the jury that "Plaintiff's every needs are taken care of by her family, so it doesn't matter that she suffered damages when the bus hit the car." R. Doc. 256, at 23.

Defendants correctly assert, however, that the evidence relating Plaintiff's income (including the lack thereof) and prior earnings is relevant to the Plaintiff's loss of earning capacity claim under Louisiana law. This Court has ruled that, while evidence of Plaintiff's income is relevant to her loss of earning capacity claim, any unearned income in the form of gifts, donations, or expected inheritance are not relevant as to the loss of earning capacity. Order, March 5, 2015, 10-11, R. Doc. 231. However, this ruling does not lead to the conclusion that the evidence adduced at trial is inadmissible simply because Plaintiff received employment benefits from her family business and did not receive paychecks. Indeed, Louisiana law does not predicate a loss of earning capacity claim solely upon evidence of actual loss of income (earnings prior to and after an injury), but "also encompasses the loss of one's earning *potential* or capacity, that is, the loss or reduction of a person's capability to do that for which he is equipped by nature, training and experience, and for which he may receive recompense." *Hobgood v. Aucoin*, 558 So. 2d 1285, 1292 (La. Ct. App. 1990) *writ granted*, 563 So. 2d 889 (La. 1990) *and aff'd*, 574 So. 2d 344 (La. 1990) (citing *Henry v. Nat'l Union Fire Ins. Co.*, 542 So. 2d 102, 106 (La. Ct. App. 1989) *writ denied*, 544 So. 2d 405 (La. 1989) and *writ denied*, 544

14

So. 2d 405 (La. 1989)); *see also Barocco v. Ennis, Inc.,* 2003 WL 1342973 (E.D.La. 2003) (Vance, J.); *Folse v. Fakouri*, 371 So. 2d 1120, 1124 (La. 1979). Thus, "while [the plaintiff's] earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn." *Folse*, 371 So. 2d at 1123. A plaintiff may recover in spite of the fact that she was unemployed or never took advantage of her capacity to earn. *Id.* at 1123-24. Evidence relating to the Plaintiff's employment benefits and lack of income, thus, neither forecloses her recovery nor was irrelevant in determining her loss of earning capacity.

### 3. Modified Photograph of Plaintiff's Damaged Vehicle

In addition, Plaintiff argues that the Defendants offered an excluded exhibit, Mr. Loumiet's expert report, which contained a photograph of Plaintiff's vehicle post-accident that Plaintiff alleges had been "altered by defense counsel during questioning" at Mr. Loumiet's deposition, and that Defendants used the exhibit to suggest to the jury that there was more than one point of impact on the Plaintiff's vehicle. (R. Doc. 256, 18). Thus, Plaintiff asserts that introduction of this exhibit was an attempt to confuse the jury with an alternate theory of the facts of the accident and was prejudicial to the Plaintiff. Defendants counter that the photograph was used as impeachment evidence during cross-examination of Mr. Loumiet and as a demonstrative in closing.

The Court first notes that "excluded exhibit" at issue here was not Mr. Loumiet's expert report in its entirety but a photograph contained therein. This photograph depicted the Plaintiff's damaged car with modifications (two arrows) added by Mr. Loumiet[6] and incorporated into his expert report. The photograph itself, which depicted the Plaintiff's damaged car, had been admitted into evidence. In a prior ruling, the Court allowed the

---

[6] Though Plaintiff asserts that Defense counsel modified the photograph at Mr. Loumiet's deposition, it was established at trial that Mr. Loumiet had modified the photograph. *See* Trial Tr. vol. 1, 268-270.

Defendants' use of photographs of Plaintiff's damaged car to be admitted to demonstrate liability or fault in the accident but not to show that the force of impact was the legal cause of Plaintiff's physical injuries. *See* Order, March 6, 2015, R. Doc. 240.

The photograph with arrows as modified by Mr. Loumiet, however, was never admitted into evidence. *See* Defs.' Trial Exhibit List, R. Doc. 248; Pl.'s Trial Exhibit List, R. Doc. 249. Although Plaintiff attempted to introduce all expert reports into evidence, as memorialized in the Pretrial Order, R. Doc. 179, the Court did, as Plaintiff recounts, alert Plaintiff to the general rule that expert reports are inadmissible as hearsay but may be the subject of testimony and may be used to impeach a witness or refresh a witness' recollection. *See Flowers v. Striplin*, No. CIV. A. 01-1765, 2003 WL 25683914, at *1 (E.D. La. May 22, 2003)(noting the aforementioned general rule).

Here, the Defendants properly used the modified photograph (without the expert report) as a demonstrative aid and to impeach Mr. Loumiet's testimony as it related to the issue of liability.[7] Defense counsel also used the photograph modified by Mr. Loumiet on direct examination of Mr. Dean Tekell, who testified as to his opinion on what the difference between one point of impact or two points of impact causing damage would indicate. Trial Tr. vol. 4, 946-47. Plaintiff's counsel objected. Trial Tr. vol. 4, 947. While the Court allowed the photograph for demonstrative use, the defense counsel stated that he would not continue to use

---

[7] Defense counsel impeached Mr. Loumiet based on his testimony that there was only one point of impact with the photograph from his expert report showing that he placed two arrows showing two points of impact. *See* Trial Tr. vol. 1, 268-270. Mr. Loumiet's explanation was that he did indicate two areas where damage occurred but the electronic projector did not correctly mark where he touched the screen. Trial Tr. vol. 4, 268. He testified that he nevertheless explained on direct that the area of damage occurred "from that point back" on the vehicle, referring to the front of the tire to the door. Trial Tr. vol. 4, 269. Mr. Loumiet acknowledged another area of damage: "Yeah, I do have what appear to be some marking considerably less than the far right one, but that was the other option I entertained was that was the tire of the bus moving into the door of the car, and then along with that, the front right corner of the bus moving into the left fender of the car. Those are the two possibilities I entertained." Trial Tr. vol. 4, 269. In closing argument, Defense counsel used the photograph as a demonstrative, pointing out the difference between the Defendant's exhibit of the same picture without the arrows and Mr. Loumiet's picture with arrows. Trial Tr. vol. 5, 1011, R. Doc. 262.

16

the photograph. Trial Tr. vol. 4, 947-48.  To the extent that the Plaintiff alleges the brief presentation of the photograph during direct examination of Mr. Tekell was improper, any prejudicial effect or potential confusion to the jury is mitigated by the fact that both Mr. Loumiet and Mr. Tekell offered explanations for either one or two areas of impact and that the photograph itself (without modifications) was introduced into evidence.  Therefore, in addition to the fact that the underlying photograph was properly admitted into evidence, the Court finds that the photograph was properly employed as a demonstrative aid or used for impeachment and was neither prejudicial nor confusing to the jury.

### C. Jury Deliberations

Finally, Plaintiff asserts that the jury deliberation process, wherein the jury submitted a question to the Court, strongly suggested that the jury initially found the Defendants negligent but that, upon realizing that this would entitle the Plaintiff to damages, returned a verdict in favor of the Defendants.[8]  Defendants note that Plaintiff's claim regarding the jury's deliberative process is based solely upon speculation, and that Plaintiff has no valid proof of the claim as the only proof she could have obtained, if any, would violate Federal Rule of Evidence 606(b) by asking a juror about the process.  To the extent that Plaintiff bases her argument on the Court's answer to the jury's question, the Defendants argue that Plaintiff again speculates about the

---

[8] The jury submitted the following question to the Court: "#6 If we think she got hurt in the 3-29-11 MVA but she was at fault, should we answer 'Yes' or 'No'?" (R. Doc. 247-1).  Interrogatory number 6 asked whether the jury found the Plaintiff suffered any damage as a result of the accident and instructed the jury to answer interrogatory number 7 on the amount of damages awarded if they answered "Yes."  *See* R. Doc. 247-2.  Out of the presence of the jury, the Court noted that the jury's question implied confusion. To have answered interrogatory number 6 implied that they answered "Yes" to all prior questions, finding both Plaintiff and Defendants negligent; to have answered otherwise would imply that the jury ignored the instruction under interrogatory number 1, which stated that they were to sign and date the form and return to the court room if they answered interrogatory number 1 "No". In answering the jury, the Court informed them that the Court made the assumption that they answered all questions "Yes" prior to number 6 and that, if that assumption was incorrect, to re-examine the form. The Court then instructed that, based on those assumptions, the jury should reply "Yes" to interrogatory number 6.  *See* Trial Tr. vol. 5, 1059-1066.

17

jury's deliberative process and did not make an objection to the Court's answer at that time. Further Defendants note that the jury verdict form was not inconsistent.

The Court does not find merit in Plaintiff's argument.  "Other than turning to pure speculation," the Court cannot determine why the jury deliberated for the length of time that they did or why the jury posed the question to the Court that they did.  *See Ford v. J.B. Hunt Transp., Inc.*, No. CIV.A. 12-414-RLB, 2015 WL 300411, at *9 (M.D. La. Jan. 22, 2015).  Plaintiff cites no law for the proposition that the jury's question indicates how the jury reached its verdict, and Defendants correctly note that any argument based on the testimony of a juror on that point is strictly forbidden.  *See* Fed. R. Evid. 606(b).  Thus, the Plaintiff has offered no proof that this Court might consider in determining whether jury misconduct occurred.  Moreover, the jury verdict form is not inconsistent.  Though the jury filled out more of the jury verdict form than necessary, ignoring the unambiguous instruction to "sign and date this form and return to the Courtroom" below interrogatory number one, the jury's verdict was not inconsistent: the jury found Lillie Rea solely at fault for the accident. *See* Jury Verdict Form, R. Doc. 247-2.

### IV.    CONCLUSION

Based on the Court's independent review of the evidence, evaluation of witness testimony, and examination of any alleged error during the course of trial, the Court finds that neither mandatory nor discretionary grounds for the granting of a new trial exist.  For the foregoing reasons, the Court will not disturb the jury's verdict that the Defendants, Larry Westphal and Wisconsin Coach Lines, Inc., were not at fault for the accident. Accordingly,

**IT IS ORDERED** that the Plaintiff's Motion for New Trial (R. Doc. 256) is **DENIED.**

New Orleans, Louisiana, this  15th  day of        July       , 2015.

_____
**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT JUDGE**